| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | DATE FILED<br>January 31, 2025 6:19 PM<br>FILING ID: F77C2A965348B<br>CASE NUMBER: 2025CV30407 |
| VALARIE MORGAN, individually and behalf of all those similarly situated,<br><br>***Plaintiff***<br><br>***v.***<br><br>THE KROGER CO.; DILLON COMPANIES, LLC d/b/a KING SOOPERS and CITY MARKET; ALBERTSONS COMPANIES, INC.<br><br>***Defendants*** | ▲ **COURT USE ONLY** ▲ |
| Attorney for Plaintiffs:<br><br>Name:   Alexander Hood, Atty Reg. # 42775<br>Address:   TOWARDS JUSTICE<br>    303 E. 17th Ave., Suite 400<br>    Denver, CO 80203<br>Telephone:   (720) 239-2606<br>Email:   alex@towardsjustice.org | Case Number:<br><br>Div.:<br><br>Ctrm: |
| **COMPLAINT AND DEMAND FOR JURY TRIAL** | |

Plaintiff Valarie Morgan, on behalf of herself and all those similarly situated, brings this Complaint and Demand for Jury Trial against Defendants The Kroger Co. ("Kroger"), Dillon Companies, LLC ("Dillon," "King Soopers," or "City Market"), and Albertsons Companies, Inc. ("Albertsons") for the harm they caused Plaintiff and the proposed Class as a result of an anticompetitive and unlawful no-poach agreement designed to suppress the wages of Plaintiff and other Colorado supermarket workers. Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences, and upon information and belief as to all other matters.

## I.   INTRODUCTION

1. Together, Kroger and Albertsons operate nearly all chain supermarkets in the State of Colorado. Kroger and Dillon operate 148 stores in Colorado under the "King Soopers"

EXHIBIT A

and "City Market" names.[1]  Albertsons operates 105 stores in Colorado under the "Safeway" and "Albertsons" names.  Combined, they account for well over 50 percent of chain supermarket stores in Colorado.

2. The vast majority of employees at Kroger/Dillon's King Soopers and Albertsons' Colorado Safeway stores are members of United Food and Commercial Workers ("UFCW") Local 7 and are represented by Local 7 for collective bargaining with management.  The terms and conditions of their employment are set forth in a collective bargaining agreement ("CBA").

3. In 2022, the CBAs concerning Colorado grocery workers represented by Local 7 were set to expire.  Local 7 and Albertsons/Safeway reached an agreement to extend the expiring CBAs to negotiate a renewal.  Local 7 and Kroger/King Soopers did not agree to an extension, however, allowing the CBA covering Local 7 members who worked at King Soopers stores to expire.  Local 7 subsequently went on strike at King Soopers stores.  The strike lasted ten days, starting on January 15, 2022.

4. A strike is an essential means of increasing the leverage a union has with an employer in contract negotiations.  During a strike, workers typically picket the employer's business, placing considerable financial and public pressure on the employer, as the employer's customers may divert their business to competitors to avoid crossing a picket line.  Workers have a legal right to go on strike so long as appropriate procedures are followed.

5. An employer dealing with a strike often faces competitive threats on two fronts: First, competitors may be able to hire away or poach striking workers.  And second, competitors may be able to lure customers.  This competition places pressure on an employer to bring a strike to an end, including by making more concessions to workers at the bargaining table.

6. In a competitive market unmarred by collusion, Albertsons' Safeway stores—Kroger's and King Soopers' primary (and nearly sole) rival in Colorado—would have taken advantage of the strike by hiring away King Soopers workers and soliciting its customers.  Instead, Albertsons colluded with Kroger and King Soopers to avoid such competition during the strike.

7. To counteract Local 7's negotiating leverage during the strike, Kroger and King Soopers asked Albertsons to enter into an illicit agreement not to hire or poach any King Soopers workers or to solicit any of its pharmacy customers.  Albertsons agreed not to do so and confirmed this agreement by e-mail.  It then implemented the agreement by, among other things, informing its Safeway personnel throughout Colorado not to hire any person working for King Soopers and not to solicit pharmacy customers.

8. The anticompetitive agreement was successful.  It artificially reduced the union's bargaining power during negotiations, while increasing the leverage of Kroger's and King

---

[1] Unless otherwise specified, any reference to "King Soopers" below shall be deemed to include both "King Soopers" and "City Market."

EXHIBIT A

Soopers' management.  As a result, the CBAs that were ultimately adopted between Kroger/King Soopers and Local 7 reflected wage scales that were lower than they would have been if the negotiation had taken place in a market that was not tainted by unlawful collusion.

9. Albertsons/Safeway shared Kroger's and King Soopers' anticompetitive goals. They knew that their own negotiations with Local 7 would take place against the backdrop of any agreement reached between King Soopers and Local 7.  They supported the unlawful agreement with Kroger and King Soopers because they recognized a "need [for] Kroger to hold the line" in its union negotiations and to "stay strong."  The King Soopers-Local 7 agreement set the baseline for the negotiations between Albertsons and Local 7, as it had done historically. Because the King Soopers-Local 7 CBAs reflected artificially depressed wage scales that were the product of collusion, the CBAs reached between Albertsons and Local 7 also reflected wage scales that were lower than they otherwise would have been but for Albertsons/Safeway's and Kroger/King Soopers' unlawful collusion.

10. Plaintiff brings this case to remedy the anticompetitive harm of Defendants' unlawful collusion.

## II.    PARTIES

11. Plaintiff Valarie Morgan is a natural person and citizen of the State of Colorado. She has worked at a King Soopers store in Colorado since July 2017 and is represented by Local 7.  Ms. Morgan's wages were based on the CBAs negotiated between King Soopers and Local 7 and were artificially depressed due to the collusion between Kroger/King Soopers and Albertsons/Safeway.

12. Defendant The Kroger Co. is a public company incorporated in the State of Ohio, with a principal place of business in the State of Ohio.

13. Defendant Dillon Companies, LLC is a limited liability company organized in the State of Kansas with a principal place of business in the State of Colorado.  Dillon is a subsidiary of Kroger, and, in the State of Colorado, does business as King Soopers and City Market. Because King Soopers and City Market are trade names for Dillon, all references to either below are also references to Dillon.  Dillon employs King Soopers and City Market workers, and is the entity that appears on their paychecks and W2 forms.

14. Defendant Albertsons Companies, Inc. is a public company incorporated in the State of Delaware, with a principal place of business in the State of Idaho.

## III.    JURISDICTION AND VENUE

15. This Court has jurisdiction pursuant to C.R.S. § 6-4-110(1).

3

16. Venue is proper in this district pursuant to C.R.S. § 6-4-110(2) because the alleged violation occurred in this district, and Plaintiffs and other Local 7 members working for Kroger/King Soopers and Albertsons/Safeway suffered damages in this state.

## IV.    FACTUAL ALLEGATIONS

### A. Albertsons' Safeway Stores and Kroger/Dillon's King Soopers Stores Compete for Labor in Colorado

17. Kroger/King Soopers and Albertsons/Safeway compete with one another to hire and retain grocery workers in Colorado. They monitor wages and benefits in local labor markets, including one another's, and often attempt to match or exceed competing wage and benefit offers. They also promote employees, offer retention bonuses, or otherwise offer improved hours to retain high-performing workers. Kroger/King Soopers and Albertsons/Safeway also generally try—and often do—poach grocery workers from one another.

18. The vast majority of Kroger and Dillon's King Soopers and City Market stores and Albertsons' Safeway stores in Colorado are within close proximity to one another. Most grocery store workers prefer to work near where they live, so the proximity of Defendants' stores means that employees view them as being reasonable substitute places of employment or within the same effective zone of competition. Employees can switch between employment at King Soopers and Safeway without relocating or making major changes to their commuting patterns (and, as explained below, without losing their union benefits).

19. For example, the following graphic demonstrates how King Soopers (blue) and Safeway (red) stores are clustered in proximity to one another in the Denver area:

4



20. Similarly, the graphic below demonstrates the proximity of Defendants' stores in the Fort Collins area:



21. The graphic below demonstrates the proximity of Defendants' stores in the Colorado Springs area:

5

EXHIBIT A



22. As illustrated above, Kroger/King Soopers and Albertsons/Safeway compete head-to-head throughout the State of Colorado, including with respect to labor as well as grocery and pharmacy customers.

23. Because they are union employers, Kroger/King Soopers and Albertsons/Safeway primarily compete with one another for labor through collective bargaining negotiations. Such competition results in higher wages, better benefits, and improved working conditions for employees.

24. Most people who work in Kroger/Dillon's King Soopers and Albertsons' Safeway supermarkets in Colorado are members of a union, UFCW Local 7. Local 7 represents those workers in negotiated agreements that determine the terms and conditions of their employment, including their wages.

25. Collective bargaining agreements ("CBAs") are negotiated every few years and determine each union worker's wages, health and pension benefits, scheduling, leave, and other workplace conditions.

26. Union grocery workers can move between grocery employers that are covered by the same union while retaining their pension and healthcare benefits, as well as other valuable workplace benefits and protections provided by the CBAs. However, when union workers leave employment with a union employer and move to a non-union employer or an employer covered by a different union, they lose any non-vested CBA benefits and protections that might otherwise be available to them.

6

EXHIBIT A

27. Because union grocery workers value the benefits they are provided by their CBAs, such as pension, healthcare, and other benefits, they have a strong preference to remain with employers covered by their union until those benefits have vested. Workers at Kroger/Dillon's King Sooper and City Market stores therefore generally view Albertsons as the closest alternative employer, and vice versa, because switching between those employers enables them to retain their union benefits. Thus, although several other potential employers—such as Walmart, Amazon's Whole Foods, Sprouts, Costco, and Target—may be present within reasonable proximity to Kroger's King Soopers or Albertsons' Safeway stores throughout Colorado and may hire workers with similar skills, union workers do not view them as being reasonable substitutes with King Soopers or Safeway because none of them are union employers. Workers would therefore have to sacrifice their unvested union benefits if they moved there, which is a significant economic barrier. Therefore, a hypothetical monopsonist would not need to control those alternative places of employment to exercise monopsony power over workers who are represented by Local 7. By colluding, Kroger/King Soopers and Albertsons/Safeway exercise such power over unionized labor on their own.

28. Collective bargaining negotiations are bilateral by default. On one side of the bargaining table are the workers of a single company (represented by their union), and on the other, that same company's management. The only way for workers or management of another company to participate in such negotiations is by mutual agreement.

29. Bilateral negotiations can favor workers because they increase competitive pressures on management, including worries that other companies will poach or hire their workers or lure their customers in the event of a strike. Yet management can also benefit to some extent when negotiations are bilateral, because bilateral negotiations reduce the number of employees in a union who could be involved in a potential walk-out.

30. Negotiations between Local 7 and King Soopers proceeded in this bilateral fashion—that is, independently of negotiations between Local 7 and Safeway (or any other company).

31. Local 7 believes these independent bilateral negotiations allow it to leverage the fact that Kroger/King Soopers and Albertsons/Safeway are separate companies—competing for the same workers and customers—to negotiate better terms of employment for its members. Local 7 can typically play Kroger/King Soopers and Albertsons/Safeway against one another during CBA negotiations to secure better outcomes for union workers at both companies.

32. To prepare for CBA negotiations, Defendants survey wages and benefits in the local areas subject to the CBA. Hiring decisions are typically made at the store level, because grocery workers prefer to work near where they live. Indeed, as demonstrated above, the vast majority of Kroger/Dillon's King Soopers and Albertsons' Safeway stores in Colorado are close to one another, thus increasing direct competition between the two for workers. To remain competitive, Defendants monitor and often match each other's wage increases for union grocery workers.

33. In Colorado, Kroger/King Soopers and Albertsons have a combined share of union grocery labor that far exceeds 65% in the CBA areas covering Boulder and Louisville; Broomfield; Colorado Springs; Denver; Fort Collins; Grand Junction and Clifton; Greeley; Longmont; Loveland; Parker, and Pueblo.

34. In these areas, Defendants negotiate CBAs separately against Local 7, even if negotiations may be occurring concurrently. During those negotiations, Local 7 tries to play Kroger/King Soopers and Albertsons/Safeway against one another, attempting to secure a favorable deal from one Defendant before leveraging that deal against the other Defendant to demand similar or better terms. This leveraging is only possible because Defendants closely compete for workers and customers, and they do not want to risk losing those workers and customers to a competitor. Local 7 has a history of being able to improve wages, benefits, and working conditions for union workers by leveraging competition between Kroger/King Soopers and Albertsons/Safeway.

35. Defendants are well-aware of the implications of Local 7's strategy, which is sometimes described as "whipsaw" bargaining. Indeed, once Local 7 conducted a strike vote as to Kroger/King Soopers, Kroger and King Soopers executives engaged in extensive discussions about ways to counteract Local 7's leverage. In draft talking points that Jon McPherson, Kroger's VP of Labor Relations, prepared for Senior VP and Chief People Officer Tim Massa and other senior executives at Kroger for possible discussion with their counterparts at Albertsons (specifically, COO Susan Morris and CEO Vivek Sankaran), Mr. McPherson stated that "Local 7 [is] attempting to whipsaw our two companies [Albertsons & Kroger]. If our two companies allow the UFCW to continue to leverage this strategy, as they recently did to both of us in Portland, then our expected settlements will be much greater than either of us planned." In other words, Kroger/King Soopers understood that the whipsaw strategy typically used by Local 7 had the usual effect of resulting in higher wages in the CBAs that are ultimately adopted.

36. Indeed, Local 7's primary leverage during CBA negotiations is the ability to credibly threaten a strike and to sustain one if it is called. When workers withhold their labor during a strike, they also encourage customers to shop at competing grocery stores, preferably another union grocery employer. A strike is effective not only because the employer temporarily loses sales and customers to competing supermarkets, but also because once a customer shops at a competitor, they may never return to the original supermarket.

37. When on strike, workers still need to earn an income. Unions often pay strike benefits to workers, but they are usually below the wage workers would normally earn from their employer or from other employers. Further, health benefits are not guaranteed indefinitely during a strike. Thus, a strike may also be a prime time for a worker to consider employment with a different employer covered by the same union. A strike is also effective because the employer risks losing employees to competing supermarkets.

38. Local 7 leverages the fact that Kroger/King Soopers and Albertsons/Safeway compete for workers and customers by striking or threatening to strike Kroger/King Soopers and encouraging Kroger/King Soopers' customers to shop elsewhere, including at

8

EXHIBIT A

Albertsons/Safeway, and vice versa. Once either Kroger/King Soopers or Albertsons/Safeway agrees to a certain term in a union contract, the union can then turn to the other employer and threaten a strike if it does not follow suit by agreeing to similar or better terms.

### B. The 2022 CBA Negotiations and Defendants' Collusive Agreement

39. Local 7's strike against Kroger/King Soopers in Colorado illustrates how Local 7 plays Defendants off one another during a strike.

40. In January 2022, the CBAs covering Local 7 employees at Albertsons/Safeway and Kroger/King Soopers' Colorado stores were set to expire. Local 7 reached an agreement with Albertsons/Safeway to extend the soon-to-be expired CBAs to buy more time for negotiations about a renewal. There was no similar agreement with Kroger/King Soopers, however, so the King Soopers CBA expired.

41. Consequently, Local 7 struck Kroger and Dillon's King Soopers supermarkets in the Denver, Colorado metro CBA areas, including Boulder, Louisville, and Parker. The strike lasted 10 days.

42. Leading up to and during the strike, King Soopers' union grocery workers encouraged King Soopers customers and employees to transfer their prescriptions to and shop at Albertsons' Safeway stores instead of King Soopers or City Market stores.

43. King Soopers and Kroger knew that a strike created a credible risk of losing customers and employees. Indeed, Albertsons and Safeway also anticipated that the strike would cause King Soopers customers to divert their business to Safeway. Albertsons and Safeway closely tracked the impact of the King Soopers strike on Safeway's own sales with reports prepared by Zbigniew Fusiarz, then Financial Analyst and current Finance Manager at Safeway in Albertsons' Denver Division. The specific contents of those reports are currently under seal in the Colorado Attorney General matter. *See State of Colorado v. The Kroger Co.*, *et al*, No. 2024CV30459 (Colo. Super. Ct.), Dkt. 1 ¶¶ 128-29 ("Colorado AG Compl.").

44. Upon information and belief, King Soopers and Kroger's concern about the expected and actual loss of sales led them to ask Albertsons not to hire any King Soopers' workers during the strike or to solicit any King Soopers' customers.

45. The agreement was spelled out in an e-mail between King Soopers, Kroger, and Albertsons employees responsible for labor relations. *See* Colorado AG Compl. ¶ 153.

46. Specifically, on January 9, 2022, Daniel Dosenbach, Senior VP of Labor Relations at Albertsons, wrote to his counterpart at Kroger, Jon McPherson, the VP for Labor & Associate Relations at Kroger, as follows:

9

> From: Daniel Dosenbach REDACTED
> Sent: Sunday, January 9, 2022 7:50 AM
> To: McPherson, Jon K REDACTED
> Cc: Brent Bohn REDACTED
> Subject: RE: EXTERNAL EMAIL: Union Communications
>
> Jon,
>
> 1. We don't intend to hire any King Soupers employees and we have already advised the Safeway division of our position and the division agrees.
> 2. With regards to Rx, we don't intend to solicit or publicly communicate that King Soupers employees should transfer their scripts to us. However, when a customer brings in a new or transferred script, we don't inquire as to why the customer is transferring or where they work, nor do we make it a practice to turn away customers.
>
> Both Brent and I will be available to discuss the negotiations this week.
>
> Dan

47. This agreement was then communicated internally within the Denver Division of Albertsons/Safeway, which is responsible for most of Colorado, including the Front Range.

48. Brent Bohn, Albertsons' Group VP of Labor Relations, forwarded the email documenting the agreement to other executives with the instruction: "let's make sure the Denver team understands the below two things"—*i.e.*, the agreement not to hire any King Soopers employees or to solicit King Soopers pharmacy customers—along with the caution, "Please don't forward the email."

49. Albertsons' Denver Division President, Todd Broderick, restated the agreements in an email to Albertsons' COO Susan Morris, stating "we have agreed to not hire [King Soopers'] employees and not actively solicit their pharmacy customers."

50. Within the Kroger corporate family, Mr. McPherson also relayed the agreement to fellow Kroger and King Soopers executives, including Kroger CEO Rodney McMullen and Joe Kelley, President of Dillon's King Soopers & City Market Division. At all times, Dillon and Kroger worked together to carry out the anticompetitive scheme alleged herein.

51. According to the Colorado AG, Mr. Broderick also confirmed the existence of the agreement not to hire Kroger's King Soopers employees during testimony provided to the FTC. In another email, Mr. Broderick also stated, "we agreed to not hire any existing employees" from King Soopers and "to not target King's Pharmacy Customers."

52. Further, the Colorado AG alleged that Mr. Broderick also told another Albertsons employee, Andy Lukes (one of Albertsons' principal labor negotiators in Denver), that he "wishe[d] [Albertsons] would have gotten an agreement from King[] that they would not poach [Albertsons] employees either," suggesting that Kroger and King Soopers first got an agreement from Albertsons not to hire striking King Soopers employees.

10

53. According to the Colorado AG, the purpose of the agreement was Albertsons' "need [for] Kroger to hold the line" in its negotiations with Local 7, and to "stay strong." By "agree[ing] not to hire their employees," Albertsons and Kroger/King Soopers restrained the ability of King Soopers' striking employees to find alternative employment and to leave King Soopers, which strengthened its ability to resist union demands at the negotiating table. This agreement had the effect of undermining each employer's ability to engage in genuinely independent bargaining with Local 7.

54. Ultimately, the strike ended when King Soopers and Kroger agreed to certain improvements to their CBA, including wage increases and safety protections for their workers. The wage increases would have been even higher but for the anticompetitive agreement between Kroger/King Soopers and Albertsons.

55. These CBAs were formally entered into between UFCW 7 and "King Soopers Inc., a Division of Dillon Companies, Inc." as well as "City Market, A Division of Dillon Companies, Inc." On the employers' side, they were signed by representatives of Dillon. Kroger is not a signatory to them, although it was actively involved in negotiating them along with Dillon personnel.

56. Local 7 then took the King Soopers agreement to Albertsons/Safeway, threatening that it would strike Albertsons/Safeway next. Using this leverage, Local 7 got Albertsons/Safeway to agree to the same wage increases and other important contract terms like benefits and protections to which King Soopers had acceded. Local 7 would have been able to secure even better terms with Albertsons/Safeway, too, in the absence of the unlawful collusion between Kroger/King Soopers and Albertsons/Safeway.

57. Executives from Kroger, King Soopers, and Albertsons/Safeway acknowledge that the unions' ability to play them off one another using strikes or the threat of a strike creates pressure to meet or beat each other's agreements. This competitive pressure benefits workers at both companies.

58. According to the Federal Trade Commission's petition to stop a proposed merger between Kroger and Albertsons, the two companies "have tried to coordinate and align more closely during negotiations" to counter the unions' strategy. Indeed, the FTC alleges that a 2021 labor strategy white paper was prepared for the Kroger's CEO and other senior leaders recommending how to accomplish those goals. A similar presentation was prepared for Albertsons' CEO.

C. **Kroger/King Soopers and Albertsons/Safeway's Unlawful Collusion Harmed Workers by Resulting in Lower Wage Increases and Benefits**

59. Kroger/King Soopers' and Albertsons/Safeway's agreement not to compete with one another for workers or pharmacy customers for the duration of Local 7's strike had a direct

11

EXHIBIT A

anticompetitive impact. Specifically, the bargained-for terms of the CBA with respect to wages and benefits were lower and less beneficial to workers than they otherwise would have been.

60. Kroger/King Soopers and Albertsons/Safeway's agreement reduced Local 7's bargaining power while increasing Kroger/King Soopers and Albertsons/Safeway's bargaining power because it helped King Soopers and Kroger mitigate the types of competitive and financial pressures they would normally face during a strike.

61. During a strike, union members have the option either to work a picket line, stay at home, or cross the picket line. Most workers do not cross a picket line, even though employers often offer higher than normal wages to workers who do so. Instead, they either work the picket line or stay at home.

62. However, most workers also cannot afford to go unpaid for even short periods of time. A union typically maintains a "strike fund" to mitigate the impact of lost wages on striking union members. Strike funds are not infinite, though, and if a union cannot pay its members out of a strike fund, it faces the risk that union members will abandon the strike. Unions naturally face more pressure to capitulate the longer a strike lasts. Moreover, because the hours worked in one month determines a worker's eligibility for health benefits in a future month, workers are typically not guaranteed their health benefits for the duration of a strike and potentially for a period after a strike. The fear of losing benefits may also contribute to attrition and put pressure on workers to cross the picket line.

63. At the same time, employers also face pressure to capitulate the longer a strike lasts. The pressure arises from financial losses tied to lost customer sales during a strike, as customers try to avoid crossing the picket line; from the threat of losing workers to competing employers, not just for the duration of a strike but potentially also long-term; and damage to public reputation, among other things. Further, customers and employees who switch where they shop or work may ultimately change their behavior for the long-term, not merely for the duration of a strike.

64. These dynamics are not merely theoretical: they were borne out during Local 7's strike in the Denver area.

65. Indeed, Local 7's strike had a palpable impact on Kroger's King Soopers sales. As predicted, many of King Soopers' customers did not want to cross the picket line, so they diverted their business from King Soopers stores to Safeway stores during the strike. Mr. Broderick, the President of Albertsons' Denver Division, agreed in testimony to the FTC that there was a "massive jump" in Denver-area sales during the King Soopers strike. The increase was so significant that Mr. Broderick received a congratulatory email from one of his colleagues, who asked, "I need to know what you are doing to get it." Mr. Broderick responded, "It is really simple (just have your competitor go on strike)," emphasizing, "Our major Kroger competitor (King Soopers), went on strike yesterday."

EXHIBIT A

66. The shift in customer behavior was so severe that Safeway stores were overwhelmed and struggled to meet the increase in demand. On January 17, 2022, for example, CBS News reported, "Right across the street from Safeway is a King Soopers grocery store. The parking lot at the Safeway was packed. The parking lot at the King Soopers was nearly empty."[2] Consumers' desire not to cross the picket line, according to the media, "means places like Safeway are very busy . . . It means a lot of work trying to keep shelves stocked."

67. Similarly, on January 18, 2022, Denverite reported that a customer who "lives in Aurora" "had to do her shopping in Denver" because "after visiting three Safeways near her home, she left empty handed" as "[t]he shelves at those stores . . . were pretty bare."[3]

68. Under normal circumstances, Albertsons/Safeway would have had a strong incentive to ramp up their hiring to be able to meet increases in consumer demand and keep store shelves stocked. But, instead, Albertsons/Safeway acted against their independent economic interests and agreed instead *not* to hire workers away from King Soopers, forgoing sales from customers visiting Safeway stores and leaving empty-handed.

69. Kroger/King Soopers workers were ready, willing, and able to consider working with Albertsons/Safeway in lieu of Kroger/King Soopers. As mentioned above, workers at both supermarket chains are represented by the same union, Local 7, so transitioning from one employer to the other is relatively seamless from an employee's perspective, because employees can preserve their union health and pension benefits. In contrast, to work for an employer other than Albertsons/Safeway or Kroger/King Soopers, they would have to give up unvested union benefits.

70. King Soopers' workers had an even stronger incentive to seek employment with Albertsons/Safeway because the strike conditions were harsh. Picketing was difficult in the middle of winter: temperatures during the strike dropped as low as 19 degrees Fahrenheit some days. Standing outdoors each day was physically grueling, and staying at home meant less pay from the strike fund. The financial pressure that workers faced, as well as uncertainty about how long the strike would last, would have made such workers highly motivated to consider employment at Albertsons/Safeway in the absence of the no-poach agreement.

71. But for the no-poach agreement, Kroger and King Soopers would have faced normal competitive threats from Albertsons and Safeway. If workers only went to Safeway in the short-term during a strike, that would reduce strain on the union's strike fund and mitigate pressure on the union to capitulate. If workers went to Safeway for the long-term and didn't return to King Soopers after the strike ended, that would have increased King Soopers' own hiring, recruitment, and training costs. But because Albertsons and Safeway agreed not to hire

---

[2] *See Colorado Shoppers Running Into Empty Shelves As King Soopers Strike Goes On*, CBS News Colorado (Jan. 17, 2022), https://www.cbsnews.com/colorado/news/colorado-shopping-shelves-king-soopers/.
[3] *See* Desiree Mathurin, *Safeway and other grocers see bare shelves as King Soopers strike pushes shoppers elsewhere*, Denverite (Jan. 18, 2022), https://denverite.com/2022/01/18/bare-shelves-at-safeway-and-other-grocers-as-king-soopers-strike-pushes-shoppers-elsewhere/.

13

any of King Soopers' grocery store workers during the strike, King Soopers was insulated from these competitive pressures and benefited from artificially enhanced bargaining power at the negotiating table.

72. Kroger/King Soopers' and Albertsons/Safeway's agreement that Safeway would refrain from soliciting King Soopers' pharmacy customers also helped insulate Kroger and King Soopers from pressure to capitulate. Pharmacy customers are especially prized by retail supermarkets because pharmacy customers tend to stick around long-term, including because transferring prescriptions between pharmacies is inconvenient and involves some frictions; many prescriptions require refills and therefore give rise to an ongoing relationship with periodic sales; patients tend to prefer filling all prescriptions in one pharmacy; and, importantly, pharmacy customers are more likely to cross a picket line if they need their prescriptions. Moreover, pharmacy sales lead to grocery sales, because pharmacy customers tend to do their grocery shopping within the same store. Losing pharmacy customers to Albertsons and Safeway would have been especially painful to Kroger and King Soopers and would have had longer term impacts on sales and profitability than just the temporary diversion of grocery shoppers who did not want to cross the picket line. The agreement not to solicit pharmacy customers thus artificially enhanced Kroger and King Soopers' bargaining power, to the detriment of Local 7 workers.

73. But for the collusion between Kroger/King Soopers and Albertsons/Safeway, Kroger and King Soopers would have faced more pressure to capitulate at the negotiating table than it in fact faced, and the terms of the CBA would have been more favorable to union workers than they ultimately were.

74. Importantly, there is no reason to believe that Albertsons/Safeway would have independently decided to refrain from competing with Kroger/King Soopers during the strike, but for the explicit request from Kroger/King Soopers to do so, and their explicit agreement to comply with that request.

75. Absent an express agreement between Kroger/King Soopers and Albertsons/Safeway not to compete, both would face the risk of competition from the other party during a strike and would make decisions during CBA negotiations by taking into account their knowledge of those competitive risks. Kroger and King Soopers would have felt pressure to resolve the strike more quickly, including by offering better terms to Local 7's represented employees, if they were uncertain about whether Albertsons and Safeway would compete with them during a strike by soliciting their customers and poaching or hiring their employees. Albertsons/Safeway's explicit agreement not to do so, however, mitigated that risk by giving Kroger and King Soopers an assurance that they could maintain their negotiating position with Local 7 without facing the harms and risks associated with competition from Albertsons. Similarly, Albertsons/Safeway would have had assurance that, were they to face a strike, they could count on Kroger and King Soopers to reciprocate. This dynamic, often referred to as the prisoner's dilemma, predicts that competitors will capitulate (*i.e.*, compete) to minimize their exposure—absent an agreement not to do so.

D. **All Employees At Defendants' Colorado Stores Were Harmed**

76. CBAs provide a concrete mechanism for establishing a wage structure by which all employees' wages are interrelated and, ultimately, move together.

77. Because Defendants' unlawful agreements were designed to, and had the effect of, resulting in less favorable compensation terms in the CBAs, all employees whose wages and benefits were covered or informed by the CBAs were ultimately harmed. This includes employees whose wages were not explicitly covered by the CBAs because, in practice, Defendants match non-represented workers' wages to the wage scales in the CBAs (even if those non-represented workers do not receive other CBA-related benefits).

78. The CBAs that Local 7 negotiated with Kroger/King Soopers and Albertsons/Safeway fix minimum compensation ranges for employees with similar job titles, seniority, and location. For example, the chart below reflects the negotiated wage scale for Kroger/King Soopers' Meat Wrappers/Butcher Block/Seafood Clerks in the Denver area. There are similar wage scales defined in the CBAs that apply to the job titles and categories of every proposed Class member for both Kroger/King Soopers and Albertsons/Safeway throughout Colorado.

| Denver (excluding Denver City stores), Boulder, Broomfield, Parker, Longmont, Loveland, Colorado Springs, Ft. Collins, Greeley, Pueblo | | | |
|---|---|---|---|
| CLASSIFICATION | Effective 1/9/2022 | Effective 1/29/2023 | Effective 1/28/2024 |
| MEAT WRAPPERS/BUTCHER BLOCK/SEAFOOD CLERK cont. | | | |
| After 520 hours | $16.40 | $16.95 | $17.50 |
| After 1560 hours | $16.80 | $17.40 | $18.00 |
| After 2600 hours | $17.20 | $17.85 | $18.50 |
| After 3640 hours | $17.60 | $18.30 | $19.00 |
| After 4680 hours | $18.00 | $18.75 | $19.50 |
| After 5720 hours | $18.40 | $19.20 | $20.00 |
| After 6760 hours | $18.80 | $19.65 | $20.50 |
| After 7800 hours | $21.01 | $21.81 | $22.61 |

79. One of the primary purposes of a wage structure like those reflected in the CBAs is to promote internal equity. That is accomplished by offering similar pay to employees who do similar work, and by ensuring that employees with more experience or skills are compensated accordingly. The CBAs create a compensation structure that establishes relatively fixed pay grades between groups of employees based on their skills and experience. Internal equity is also one reason why even non-represented workers end up having their wages set with reference to the CBA wage scales.

15

80. The starting base rates for each category are informed by negotiations with Local 7 and competition in the labor market. An employer who does not face competition from other employers can pay less than an employer who faces competition. To recruit and retain the best employees, an employer needs to offer pay that is at least as good as its competitors' offerings.

81. Anything that artificially affects the competitive market mechanisms by which the base pay rates are established—such as the unlawful agreement alleged herein—will also affect all the other wage rates (including overtime, holiday, and other multiplier-based wage rates) in the compensation structure that are tied to the base pay rates.

82. For example, in the chart above, the base rate in year 2022 for the listed job category progresses by $0.40 cents in each seniority-based pay band and increases by $0.55 year-to-year. If the starting base rate were higher, all other pay bands based on seniority or year would also be higher. Conversely, if the starting base rate were lower than it otherwise would have been—because of the anticompetitive agreement challenged here—then all the other pay bands would also be lower. The rigid compensation structure ensures that a common shock to wages—here, from an anticompetitive no-poach agreement—would suppress the wages of all or almost all workers in the proposed Class.

83. Defendants' unlawful agreement not to compete during the Local 7 strike thus did not only harm King Soopers workers who might have considered and obtained employment at Safeway stores, but also all other employees covered by CBAs at both King Soopers and Safeway stores or whose wages were informed by the CBA wage rates. Indeed, the purpose of the unlawful agreements was to limit the effectiveness of Local 7's strike in securing better wage terms in the CBAs that were ultimately adopted. The entire purpose was to affect the compensation of all workers at both companies, not just those who might have wanted to switch employers during the strike.

## V.    CLASS ACTION ALLEGATIONS

84. **Class Definition:** Plaintiff brings this case under Rule 23(b)(2) and (b)(3) on behalf of herself and a Class of similarly situated individuals defined as follows: "All Colorado citizens who worked at, or who will work at, a King Soopers, City Market, or Safeway location in Colorado at any time from January 9, 2022 to final judgment in this action." Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Plaintiff's counsel and Defendant's counsel; and (3) the legal representatives, successors, and assigns of any such excluded persons.

85. **Numerosity:** Class members are so numerous that joinder of all of them is impracticable. Upon information and belief, there are thousands of people in the proposed Class.

86. **Commonality and Predominance:** There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class Members. Common questions include, among others, whether (1) Defendants agreed not to compete for customers or employees during the strike; (2) whether the agreement is unlawful; (3) whether the

agreement suppressed wages and thereby injured Plaintiff and the Class; (4) whether Plaintiff and the Class are entitled to damages, restitution, disgorgement, equitable relief, and/or other relief; and (5) the amount and nature of such relief to be awarded to Plaintiff and the Class.

87. **Typicality:** All of Plaintiff's claims are typical of the claims of the Class because Plaintiff's wages were informed by the CBA wage scales negotiated by Local 7 and artificially depressed by Defendants' unlawful agreement to limit competition between one another. Further, Plaintiff and all Class Members' wages were artificially suppressed by Defendants' unlawful agreement, and they are all seeking the same remedies.

88. **Adequate Representation:** Plaintiff is an adequate representative because her interests do not conflict with the interests of the Class she seeks to represent, Plaintiff has retained counsel competent and highly experienced in complex class action litigation, and Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

89. **Predominance and Superiority:** A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class. The injuries suffered by each individual Class Member are relatively small in comparison to the burden and expense of the individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments, and it increases the delay and expense to all parties and the court system which are presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Moreover, Class Members can be readily identified and notified based on, *inter alia*, Defendants' records.

90. Defendants have acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

### FIRST CAUSE OF ACTION
### Violation of C.R.S. § 6-4-104

91. The foregoing allegations are incorporated fully, as if set forth fully herein.

92. Defendants are direct, horizontal competitors for customers, including pharmacy customers.

93. Defendants are direct, horizontal competitors for labor, including grocery store workers. They compete to recruit and retain the best employees so they can provide high quality customer service. They can and do hire one another's employees and compete for talent.

94. Defendants agreed that Albertsons/Safeway would not solicit King Soopers' pharmacy customers or hire King Soopers employees during the strike against King Soopers.

95. This agreement was an unlawful contract, combination, or conspiracy in restraint of trade. It was a naked market allocation that is *per se* unlawful and is not reasonably necessary to any procompetitive purpose. It was not reasonably necessary to any separate, legitimate business transaction or collaboration between the companies.

96. The unlawful agreement diminished competition in the labor market, and ultimately resulted in CBAs between Local 7 and Kroger/King Soopers and Albertsons/Safeway, respectively, with terms that were artificially depressed and less beneficial to employees than they otherwise would have been, but for the unlawful agreement.

97. This claim is filed for the purpose of extending, limiting, modifying, or reversing existing precedent, law, or regulation, or for the purpose of establishing the meaning, lawfulness, or constitutionality of a law, regulation, or United States or state constitutional right, and the meaning, lawfulness, or constitutionality has not been determined by the Colorado Supreme Court. Whether the agreement alleged herein is a *per se* violation of Colorado's antitrust law has not been determined by the Colorado Supreme Court.

## PRAYER FOR RELIEF

Plaintiff and the proposed Class respectfully request that the Court:

a. Certify this case as a class action and appoint Plaintiff as Class Representative and her counsel as Class Counsel;

b. Declare that Defendant's actions as set forth in this Complaint violate C.R.S. § 6-4-104;

c. Award Plaintiff and the Class damages in an amount according to proof against Defendants for Defendants' violations of C.R.S. § 6-4-104, to be trebled in accordance with that law;

d. Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiff and the Class Members are entitled;

e. Award pre-judgment and post-judgment interest on such monetary relief;

f. Permanently enjoin Defendants from enforcing or adhering to any agreement that unreasonably restricts competition as described in this Complaint, or from establishing any similar agreement in the future;

 g. Award reasonable attorneys' fees, expert fees, and costs; and

 h. Grant such further relief as this Court deems just and proper.

## JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

          Respectfully submitted,

Dated: January 31, 2025    By: s/*Alexander Hood*

          David H. Seligman #49394
          david@towardsjustice.org
          Alexander Hood
          alex@towardsjustice.org
          Juno Turner
          juno@towardsjustice.org
          TOWARDS JUSTICE
          303 E. 17th Ave., Suite 400
          Denver, CO 80203
          Tel: (720) 441-2236

          Yaman Salahi (*pro hac vice* forthcoming)
          yaman@salahilaw.com
          SALAHI PC
          505 Montgomery Street, 11th Floor
          San Francisco, California 94111
          Tel: (415) 236-2352

          *Attorneys for Plaintiff and the proposed Class*

EXHIBIT A