IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge Gordon P. Gallagher

Civil Action No. 25-cv-00837-GPG-CYC

VALARIE MORGAN, individually and behalf of all those similarly situated,

    Plaintiff,

v.

THE KROGER CO.;
DILLON COMPANIES, LLC d/b/a KING SOOPERS and CITY MARKET; and
ALBERTSONS COMPANIES, INC.,

    Defendants.

## ORDER

Before the Court are Defendants' Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (Motion to Dismiss) (D. 33) and Plaintiff's Motion for Leave to File Amended Complaint (Motion to Amend) (D. 66). The Court GRANTS the Motion to Dismiss and DENIES the Motion to Amend for the following reasons.

### I. FACTS

This civil action arises from labor negotiations involving United Food and Commercial Workers UFCW Local 7 (Local 7) and Defendants The Kroger Co. (Kroger) and Albertsons Companies, Inc. (Albertsons).[1] Plaintiff Valarie Morgan is a member of Local 7. Kroger operates supermarkets in Colorado under the King Soopers and City Market brands that are owned through

---

[1] The Court draws the operative facts as set forth in the Complaint and Demand For Jury Trial (D. 4) and proposed Plaintiff's First Amended Class Action Complaint (D. 67-1).

1

Defendant Dillon Companies, Inc.  Albertsons operates supermarkets in Colorado under the Albertsons and Safeway brands.  For simplicity, the Court generally refers to Kroger and Albertsons when referring to any of their respective brands or subsidiaries.

In 2022, the Collective Bargaining Agreements (CBAs) concerning Colorado grocery workers represented by Local 7 were set to expire.  Albertsons and Kroger negotiated separately with Local 7.  Leading up to the strike, Albertsons discussed coordinating with Kroger, but they could not agree on a Mutual Strike Assistance Agreement.  Local 7 and Albertsons reached an agreement to extend their expiring CBA to negotiate a renewal.  But Local 7 and Kroger did not agree to an extension, allowing the CBA covering Local 7 members who worked at King Soopers stores to expire.  On January 15, 2022, Local 7 went on strike at King Soopers stores.  The strike lasted ten days.

Leading up to and during the strike, Local 7 encouraged its Kroger employees to transfer their prescriptions to and seek employment at Albertsons' Safeway stores.  On January 7, 2022, Kroger's VP for Labor & Associate Relations, Jon McPherson, wrote to his counterpart Daniel Dosenbach, the Senior VP of Labor Relations at Albertsons, stating:

> Please see the attached UFCW Local 7 strike communication. Please see in this communication that the union is requesting prescription drug purchases be filled at Safeway pharmacies.  We have also heard union representatives inform our associates that if there is a strike that they should go work at Safeway.  Can you please inform me of Albertsons/Safeway intent as to how you plan to handle this to [sic] subjects?  Thanks.

(D. 67-1 at 17–18).

On January 9, 2022, Dosenbach responded for Albertsons:

2

> 1. We don't intend to hire any [Kroger] employees and we have already advised the Safeway division of our position and the division agrees.
>
> 2. With regards to Rx, we don't intend to solicit or publicly communicate that [Kroger] employees should transfer their scripts to us. However, when a customer brings in a new or transferred script, we don't inquire as to why the customer is transferring or where they work, nor do we make it a practice to turn away customers.

(D. 4 at 10). Others within Albertson's subsequently discussed this as an "agreement" not to hire Kroger employees or to solicit Kroger pharmacy customers.

The strike ended when Kroger agreed to certain improvements to their CBA, including wage increases and safety protections for their workers. Albertsons thereafter agreed to the same wage increases and other important CBA terms.

Plaintiff brought a single state law antitrust claim for creating an unlawful contract, combination, or conspiracy in restraint of trade in violation of Colo. Rev. Stat. § 6-4-104 (D. 4 at 18). Defendants moved to dismiss, and the Court held a hearing on August 25, 2025 (D. 69). The hearing included discussion that certain of Defendants' arguments for dismissal only applied because the claim was brought under state law. Shortly thereafter, Plaintiff moved to amend to replace her claim with a federal law antitrust claims for violation of the Sherman Act, 15 U.S.C. § 1 (D. 67). The amendment would also add numerous factual allegations and partially restyle others (D. 67-2). Defendants oppose amendment as futile (D. 70).

## II. LEGAL STANDARDS

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true and interpreted in the light most favorable

3

to the non-moving party, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Additionally, the complaint must sufficiently allege facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed; however, a complaint may be dismissed because it asserts a legal theory not cognizable as a matter of law. *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007); *Golan v. Ashcroft*, 310 F. Supp. 2d 1215, 1217 (D. Colo. 2004). A claim is not plausible on its face "if [the allegations] are so general that they encompass a wide swath of conduct, much of it innocent," and the plaintiff has failed to "nudge[ the] claims across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). In assessing a claim's plausibility, legal conclusions contained in the complaint are not entitled to the assumption of truth. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The standard, however, remains a liberal pleading standard, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotations and citation omitted).

The Federal Rules of Civil Procedure provide that, after initial pleadings, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "'Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment.'" *Maloney v. City of Pueblo, Colorado*, 323 F.R.D. 358, 360 (D. Colo.

2018) (quoting *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993)).  Granting leave to amend pursuant to Rule 15(a) is within the trial court's discretion.  *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006).

"A proposed amendment is futile if the complaint, as amended, would be subject to dismissal."  *Bradley v. Val-Mejias*, 379 F.3d 892, 901 (10th Cir. 2004) (quoting *Jefferson Cnty. Sch. Dist. v. Moody's Investor's Servs.*, 175 F.3d 848, 859 (10th Cir. 1999)).  "The non-moving party bears the burden of showing that the proposed amendment is . . . futile."  *Openwater Safety IV, LLC v. Great Lakes Ins. SE*, 435 F. Supp. 3d 1142, 1151 (D. Colo. 2020).  Courts often consider whether the proposed amended complaint could withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *See, e.g., Gohier v. Enright*, 186 F.3d 1216, 1218 (10th Cir. 1999) ("[T]he futility question is functionally equivalent to the question whether a complaint may be dismissed for failure to state a claim[.]").  But the futility analysis is not limited to Rule 12(b)(6).  "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal for any reason."  *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1239-40 (10th Cir. 2001).

### III. ANALYSIS

The key issue animating the briefing before the Court is whether this is bona fide antitrust case that belongs in federal court or a dressed up labor dispute.  The Court concludes that this is a labor dispute that is not cognizable under antitrust law and, therefore, dismisses the claim and denies amendment as futile.

The Supreme Court of the United States has long recognized a non-statutory labor exemption.  Looking to the history and content of the labor and antitrust laws as they developed side-by-side over time, it "found in the labor laws an implicit antitrust exemption that applies

where needed to make the collective-bargaining process work." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 234 (1996). The Supreme Court recognized in the labor laws "a national labor policy favoring free and private collective bargaining [through] good-faith bargaining over wages, hours, and working conditions" and delegation of "related rulemaking and interpretive authority to the National Labor Relations Board ([NLRB])." *Id*. at 236 (citations omitted). The "exemption interprets the labor statutes in accordance with this intent, namely, as limiting an antitrust court's authority to determine, in the area of industrial conflict, what is or is not a 'reasonable' practice" under the antitrust laws. *Id*. at 236–37. Because many agreements between and among groups of employers and employees potentially restrict competition, "the implicit exemption recognizes that, to give effect to federal labor laws and policies and to allow meaningful collective bargaining to take place, some restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions." *Id*. at 237.

In *Brown*, the Supreme Court addressed the post-impasse unilateral imposition of terms by a multi-employer bargaining unit. *Brown*, 518 U.S. at 234   Professional football players asserted that the agreement among football clubs to impose the same terms on all players was an anticompetitive agreement that suppressed wages. *Id*. at 235. The Supreme Court held that the statutory labor exemption applied to multi-employer bargaining units and concluded that the exemption shielded the football clubs' joint action from antitrust scrutiny. It noted that the shielded conduct:

> took place during and immediately after a collective-bargaining negotiation. It grew out of, and was directly related to, the lawful operation of the bargaining process. It involved a matter that the parties were required to negotiate collectively. And it concerned only the parties to the collective-bargaining relationship.

*Id*. at 250. The Supreme Court explained that its holding would not shield all similar actions from review because "an agreement among employers could be sufficiently distant in time and in circumstances from the collective-bargaining process that a rule permitting antitrust intervention would not significantly interfere with that process." *Id*.

Defendants urge that the non-statutory labor exemption applies to Plaintiff's antitrust claims regardless of whether they are brought under state or federal law (D. 33 at 26–28; D. 70 at 9–10). Plaintiff does not argue that the non-statutory labor exemption is applied differently under state or federal law (D. 49 at 16). Instead, with regard to both its state law claim and potential federal claim, it argues that the exemption does not apply to its claims relying on caselaw developed in the federal antitrust context (*id*.; D. 71 at 2–3).

Plaintiff notes that, the "bargaining relationships here were bilateral, rather than a form of multiemployer bargaining" as in *Brown* (D. 49 at 16). She urges that this distinction is legally significant because, "in contrast to bilateral negotiations—which involve a single union and a single employer—multiemployer negotiations bring more than one employer to the same negotiating table" (*id*.). And multiemployer bargaining negotiations require the consent of all participants (*id*. at 17) (citing *Resort Nursing Home v. N.L.R.B.*, 389 F.3d 1262 (D.C. Cir. 2004)). Plaintiff notes that Defendants "fail to cite a single case that applies the nonstatutory labor exemption to an agreement solely between employers who are not engaged in multiemployer bargaining" (D. 71 at 6). She asserts that, in contrast, the "Ninth Circuit's decision in [*California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118 (9th Cir. 2011) (en banc)] establishes that the nonstatutory labor exemption does not protect collusion amongst employers outside of consensual multiemployer bargaining, or even when the members of a multiemployer bargaining unit reach

an agreement insufficiently connected to the [National Labor Relations Act's (NLRA)] concerns" (D. 49 at 18).

The *Safeway* case also involved the staggered expiration of CBAs with supermarket chains. "Before the contracts expired and with the consent of the union, Albertson's, Ralphs, and Vons formed a multi-employer bargaining unit in the summer of 2003 for negotiation of a successor labor contract." *Safeway*, 651 F.3d at 1123. "Another grocery chain, Food 4 Less, had a separate contract with [the union] that was set to expire several months later." *Id*. (footnote omitted). All four grocers "entered into a Mutual Strike Assistance Agreement ('MSAA') in September 2003, in anticipation of the potential use of 'whipsaw' tactics, where unions exert pressure on one employer within a multi-employer bargaining unit through, for example, selective strikes or picketing." *Id*. (footnote omitted). The MSAA required all grocers to lock out union employees if the union struck any grocer. *Id*. The "MSAA also included a revenue-sharing provision ('RSP'), providing that in the event of a strike/lockout, any grocer that earned revenues above its historical share relative to the other chains during the strike period would pay 15% of those excess revenues as reimbursement to the other grocers to restore their pre-strike shares." *Id*. Negotiations broke down and the union struck one grocer, resulting in the other grocers locking out union workers. *Id*. The State of California sued, alleging that the RSP violated the Section 1 of Sherman Act. *Id*. at 1124.

Because of *Safeway's* procedural posture, the Ninth Circuit addressed only the RSP and did not address other aspects of the MSAA, such as the lockout provision. It concluded that, "under the totality of circumstances here, and in light of the history and logic of the exemption as well as the Supreme Court's guidance in *Brown*, application of the exemption to shield the RSP

8

from antitrust scrutiny is not warranted." *Safeway*, 651 F.3d at 1129. The Ninth Circuit noted that the "agreement to share revenues during and shortly after a labor dispute does not play a significant role in collective bargaining, nor is it necessary to permit meaningful collective bargaining to take place." *Id*. at 1130. If found the concerns underlying *Brown* absent because the "RSP does not relate to any core subject matter of bargaining, namely wages, hours, and working conditions, but rather relates principally to the relative revenues of the grocers in the market and the temporary, artificial maintenance of those revenues." *Id*. The Ninth Circuit focused on how the "RSP concerned the 'business' or 'product' market, rather than the labor market" and quoted with approval the principle that "'[t]he case for the applicability of the non-statutory exemption is strongest where the alleged restraint operates primarily in the labor market and has only tangential effects on the business market.'" *Id*. (quoting *Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 536 F.3d 68, 79 (1st Cir. 2008)). Additionally, the Ninth Circuit explained that "the inclusion of a non-member of the collective-bargaining unit, Food 4 Less, in the agreement to share revenue during the terms of the strike counsels against application of the exemption" because it suggested the conduct was "not anchored in the collective-bargaining process and should instead be subject to scrutiny by antitrust laws designed to prevent unreasonable restraints." *Id*. at 1131.

Plaintiff argues that this Court should reach the same conclusion because "Kroger and Albertsons were not members of the same bargaining unit" and, instead, "had independent disputes with UFCW [Local] 7 that were proceeding on separate paths" (D. 41 at 19). She asserts that the alleged agreement "had nothing to do with the working conditions, wages, hours, or the terms and conditions of employment" (*id*.). Plaintiff further argues that the economic "weapons that Kroger

9

and Albertsons agreed to adopt are *not* ones that employers are otherwise permitted to use under labor law" because "it is unlawful for an employer to refuse to hire employees for their protected union activities at other workplaces" (*id*. at 21) (citing *N.L.R.B. v. Town & Cnty. Elec., Inc.*, 516 U.S. 85 (1995) and *Allina Health Sys.*, 343 N.L.R.B. 498, 499 (Oct. 29, 2004)).

Although this is a close question not guided by closely analogous precedent, the Court ultimately agrees with Defendants that the non-statutory labor exemption applies. Plaintiff faults Defendants for not citing any case where the exemption was applied to an agreement between employers not engaged in multiemployer bargaining, but Plaintiff, for her part, cites no case holding that the exemption cannot apply to employers engaged in parallel, bilateral negotiations with a union. *Safeway* is not such a case. The Ninth Circuit merely found "inclusion of a non-member to the collective-bargaining unit, Food 4 Less, counsel[ed] against application of the exemption" in the specific circumstances present there. *Safeway*, 651 F.3d at 1131. In particular, it noted that the "the inclusion of non-bargaining employers in an agreement suggests that the conduct is not anchored in the collective-bargaining process and should instead be subject to scrutiny by antitrust laws designed to prevent unreasonable restraints." *Id*.

By contrast with *Safeway*, in this case the alleged agreement was inextricably tied to the ongoing bilateral collective bargaining processes of both Kroger and Albertsons. Plaintiff's allegations are unequivocal that the alleged agreement was directly responsive to so-called economic weapons being deployed by Local 7. As part of its collective bargaining strategy, the union planned and threatened to have striking Local 7 members seek employment at another employer and for members to transfer prescriptions (D. 67-1 at 17). Kroger responded by asking for Albertsons' position these specific issues that were directly tied to ongoing labor negotiations.

10

The Court views the short extension reached by Albertsons and Local 7 as of little moment. The small asynchronicity between Kroger's and Albertsons' relationship with Local 7 does not render Albertsons' actions "sufficiently distant in time and in circumstances" from Albertsons' collective-bargaining process that Albertsons' alleged actions should be understood as occurring outside of its collective bargaining. *See Brown*, 518 U.S. at 250.[2] Thus, the events here must be understood as inexorably linked to the thrust and parry of collective bargaining negotiations, particularly in the context of potential whipsaw tactics.[3]

In further contrast to *Safeway*, the alleged agreement was directly related to labor market and only tangentially related to the business or product markets. The primary upshot of the alleged agreement was that Albertsons would not hire Kroger workers. This restraint operates only in the labor market. Albertsons rebuffed any suggestion that it would prevent Kroger workers from transferring prescriptions. At most, Albertsons is alleged to have communicated that it would not start to actively solicit Kroger employees' prescriptions, thereby maintaining the status quo.[4]

---

[2] Notably, the Supreme Court explicitly rejected the proposition that employee consent was dispositive of whether the exemption applied. *Brown*, 518 U.S. at 243–44.

[3] These whipsaw tactics are described in the Complaint and form the basis for Plaintiff's assertion that collusion among Defendants suppressed wages:
> Local 7 tries to play Kroger/King Soopers and Albertsons/Safeway against one another, attempting to secure a favorable deal from one Defendant before leveraging that deal against the other Defendant to demand similar or better terms. This leveraging is only possible because Defendants closely compete for workers and customers, and they do not want to risk losing those workers and customers to a competitor. Local 7 has a history of being able to improve wages, benefits, and working conditions for union workers by leveraging competition between Kroger/King Soopers and Albertsons/Safeway.

(D. 4 at 8). Such tactics are legal, and there is some sense in which turnabout is fair play insofar as union tactics are being directly countered by the employer in this case whereas, in *Safeway,* the RSP was a wholly separate device.

[4] Even in the proposed amended complaint, the allegations do not indicate that Kroger ever understood Albertsons would not accept prescription transfers (*see* D. 67 at 7–10).

Thus, any effect on the product market is tangential to the core labor market issues at stake—who would be permitted to work where. In such circumstances the "applicability of the non-statutory exemption is strongest." *Am. Steel Erectors, Inc.*, 536 F.3d at 79

Finally, Plaintiff's assertions that the labor-focused portion of the alleged agreements violated labor law fundamentally undermines her position. Assuming she is correct, then she and other class members, or their union, already have some prescribed labor law remedy and could pursue relief through the NLRB in accord with labor statues and regulations specifically designed to deal with such circumstances.[5] Foundational to the non-statutory labor exemption is an understanding that Congress has given authority over such issues to the NLRB. *Brown*, 518 U.S. at 234 (the exemption "thereby substitutes legislative and administrative labor-related determinations for judicial antitrust-related determinations as to the appropriate legal limits of industrial conflict"). Alongside this is the concern that Courts are not best suited "to determine, through application of the antitrust laws, what is socially or economically desirable collective-bargaining policy." *Id*. at 242. As discussed above, the alleged agreements here arose directly from a collective bargaining process as the employers' response to union strategy that primarily operates in the labor market where the exemption is at its strongest. The Court concludes that the non-statutory labor exemption applies to bar Plaintiff's antitrust claim, whether brought under state

---

[5] Defendants note that Local 7 raised challenges to the collective bargaining process with the NLRB that were dismissed (D. 58). Ultimately, even if Plaintiff is incorrect that the challenged conduct is unlawful under labor law, this too may reflect a judgment that the challenged tactics are not actually objectionable as a matter of labor policy. Some authority indicates that whether or not a labor practice is unlawful for non-antitrust reasons is irrelevant to whether the exemption applies or, at least, that this is an open question. *Am. Steel Erectors, Inc.*, 536 F.3d at 81.

or federal law. Accordingly, the Court grants the Motion to Dismiss[6] and denies the Motion to Amend as futile.

## IV. CONCLUSION

Accordingly, Defendants' Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (D. 33) is GRANTED and Plaintiff's Motion for Leave to File Amended Complaint (D. 66) is DENIED. It is FURTHER ORDERED that Plaintiff's claims is DISMISSED and the Clerk of Court shall close this case.

DATED February 6, 2026.

BY THE COURT:

Gordon P. Gallagher
United States District Judge

---

[6] Defendants request dismissal with prejudice in conclusory fashion (D. 33 at 37). Although this is the second time a similar lawsuit by Plaintiff has been dismissed, the Court declines to dismiss with prejudice. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) ("It is important to realize, however, that denial of leave to amend and dismissal with prejudice are two separate concepts.").